IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

QRG, LTD.                          :
d/b/a QUANTUM RESEARCH GROUP       :
                                   :
v.                                 :   Civil No. WMN-05-3408
                                   :
APPLE COMPUTER CO., INC. <u>et al.</u> :
                                   :

<u>MEMORANDUM</u>

Currently at issue in this patent infringement case is the construction of certain claims within a patent held by Plaintiff QRG, Inc. ("Quantum").  The parties have submitted proposed constructions to the Court and a hearing was held on May 16, 2007, in which the parties had an opportunity to argue their respective positions.  Also before the Court is Defendants' Joint Motion for Partial Summary Judgment, Paper No. 39, which has been fully briefed.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Quantum alleges that Defendants Apple Computer Co., Inc., Cypress Semiconductor Corp., Cypress Microsystems, and Fingerworks, Inc. (collectively, "Defendants"), infringe its U.S. Patent No. 5,730,165 ("the '165 Patent").  The '165 Patent is entitled <u>Time Domain Capacitive Field Detector</u> and relates to a sensor system which can be used for, among other things, controlling the supply of water emitted from faucets and drinking fountains.  Quantum alleges that certain products designed and manufactured by Defendants utilize technology which infringes

several claims contained in the '165 Patent.[1]

Generally, a capacitive field sensor detects a change in voltage that exists in an electrical field.  This change can occur when an electrical conductor, like a human hand or finger, approaches a charged object or sensing plate.  The sensing method utilized in the '165 Patent is referred to as the "charge transfer" method and it generally involves charging a smaller sensing capacitor with a voltage source and periodically transferring the charge to a larger storage capacitor.  The process of transferring the smaller charge can be repeated, causing an increase in the voltage level of the larger storage capacitor.  The presence of an electrical conductor, like a human hand, near the sensing capacitor increases its charge capacitance, thereby increasing the voltage of the storage capacitor.  By measuring the charge of the storage capacitor and comparing its capacitance to reference voltages, the sensor can determine the presence of a human hand or finger.

The '165 Patent contains 63 claims, however, Quantum alleges infringement only of claims 42-46 and 49-62.  Claims 42, 50, and 58 are independent claims, upon which the remaining claims in suit depend.  Six specific claim terms or phrases require

---

[1]  In addition to its allegations of patent infringement, Quantum also asserts claims against Defendants Cyprus Semiconductor and Cyprus Microsystems for defamation, false light, and unfair competition.  Am. Compl. ¶¶ 50-60.

construction by the Court.[2]  Specifically, the parties differ as to the meaning of the terms "ground" or "electrical ground" found in claims 42, 50, and 58, "filter means" found in claim 42, "repeating steps b) through c)" found in claim 42, "reading the output of the charge detector" found in claims 42 and 58, "pseudo-random duration" found in claims 46 and 61, and "reset means for resetting the charge measurement capacitor to a second predetermined voltage" found in claim 50.

In addition to the issue of the proper construction of the disputed claim terms, also before the Court is Defendants' motion for partial summary judgment.  In that motion, Defendants contend that claim 42 of the '165 Patent is invalid, either because the patent fails to provide a sufficient structure corresponding to the terms of that claim, or because the patent specification fails to provide a sufficient written description of the claim terms as required by statute.  Resolution of Defendants' Motion for Partial Summary Judgment will affect the Court's findings with regard to claim construction, thus, the Court will begin with a discussion of that motion.

## II. PARTIAL SUMMARY JUDGMENT

### A.  Legal Standard for Summary Judgment

---

[2]  The parties initially identified seven terms or phrases for construction, however, both parties proposed identical constructions of the term "switch crossover interval."  '165 Patent, Col. 19, lines 11-12; Col. 20, line 40.  Thus, the Court need not construe that term.  See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999) (noting that "only those terms need to be construed that are in controversy, and only to the extent necessary to resolve the controversy").

Summary judgment is proper if the evidence before the Court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact.  Id. at 323.  The non-moving party is entitled to have "all reasonable inferences . . . drawn in its respective favor."  Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1129 (4th Cir. 1987).  If the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to summary judgment as a matter of law, to withstand the motion for summary judgment, the non-moving party must produce sufficient evidence in the form of depositions, affidavits or other documentation which demonstrates that a triable issue of fact exists for trial. Celotex, 477 U.S. at 324.  Unsupported speculation is insufficient to defeat a motion for summary judgment.  Felty, 818 F.2d at 1128 (citing Ash v. United Parcel Serv., Inc., 800 F.2d 409, 411-12 (4th Cir. 1986)).  Furthermore, the mere existence of some factual dispute is insufficient to defeat a motion for summary judgment; there must be a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

4

B.  Application of 35 U.S.C. § 112, ¶ 6

In their Motion for Partial Summary Judgment, Defendants argue that the term "filter means" found in claim 42 expresses a "means-plus-function" limitation in accordance with 35 U.S.C. § 112, ¶ 6.  Section 112 ¶ 6 provides that "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  Whether § 112, ¶ 6 applies to specified claim language is a question of law.  Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 702 (Fed. Cir. 1998).  Defendants contend that, if § 112, ¶ 6 applies to the term "filter means," claim 42 must be invalidated, either due to a finding of indefiniteness under the standards provided in § 112, ¶ 2,[3] or due to a finding that the claim fails to satisfy the written description requirement of § 112, ¶ 1.[4]  Quantum argues that § 112, ¶ 6 does not express a means-plus-function limitation and that the language of claim 42

---

[3]  Section 112, ¶ 2 provides: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

[4]  Section 112, ¶ 1 provides: "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

is sufficiently definite to satisfy the statutory requirements of
§ 112.

Claim 42 of the '165 Patent provides:

> 42. A method of operating a capacitive sensor
> for sensing the presence of an object
> proximate a sensing plate by measuring a
> change in a capacitance to an electrical
> ground, the method comprising the steps of:
>
> a) setting an output of a charge detector to
> a first predetermined voltage, the charge
> detector comprising <u>filter means</u>;
>
> b) charging the plate from a voltage source
> to a second predetermined voltage;
>
> c) discharging, for a predetermined
> discharging interval, the plate into the
> charge detector;
>
> d) repeating steps b) through c); and
>
> e) reading an output of the charge detector
> as a representation of the capacitance of the
> plate.

'165 Patent, Col. 18-19, lines 57-03 (emphasis added).

It is well settled that "[a] claim limitation that actually
uses the word 'means' invokes a rebuttable presumption that §
112, ¶ 6 applies." <u>CCS Fitness, Inc. v. Brunswick Corp.</u>, 288
F.3d 1359, 1369 (Fed. Cir. 2002).  Here, the word "means" is
clearly employed in the claim term, giving rise to the
presumption of the applicability of § 112, ¶ 6.  <u>Id.</u>  This
presumption may be overcome in one of two ways.  "First, a claim
element that uses the word 'means' but recites no function
corresponding to the means does not invoke § 112, ¶ 6.  Second,
even if the claim element specifies a function, if it also
recites sufficient structure or material for performing that

function, § 112, ¶ 6 does not apply."  Rodime PLC v. Seagate
Tech., Inc., 174 F.3d 1294, 1302 (Fed. Cir. 1999) (internal
citations omitted).

Quantum attempts to overcome the presumption that § 112, ¶ 6
applies to the term "filter means" by arguing that claim 42
includes no recitation of any specified correlating function.
Quantum contends that the word "filter" which precedes the word
"means" is not used in a functional capacity, but rather to
convey a physical structure.  Defendants argue that the word
"filter" specifies the function to be performed.  Thus, under
Defendants' interpretation, the term "filter means" should be
construed to specify a means for achieving filtering.

In arguing that the word "filter" is used structurally
rather than functionally, Quantum first contends that "an attempt
to imply a function by using the gerund form of the word
[preceding the word 'means'] is improper."  Opp'n to Mot. For
Partial Summ. J. 8.  In forming this conclusion, Quantum relies
primarily on the Federal Circuit's holding in Greenberg v.
Ethicon Endo-Surgery, Inc., which found that "the fact that a
particular mechanism . . . is defined in functional terms is not
sufficient to convert a claim element containing that term into a
'means for performing a specified function[.]'"  91 F.3d 1580,
1583 (Fed. Cir. 1996).  There, the Court held that the term
"detent mechanism" was insufficient for expressing a detent
function in accordance with § 112, ¶ 6.  Id.  The Court further
noted that "many devices take their names from the functions they

perform . . . such as 'filter,' 'brake,' 'clamp,' 'screwdriver,'
or 'lock.'" Id. Relying on the logic of Greenberg, Quantum
contends that the function of filtering cannot be implied in the
construction of the term "filter means."

Unlike the term at issue here, however, the Greenberg Court
prefaced its analysis of the applicability of § 112, ¶ 6 by
noting that "in this case the pertinent claim language ['detent
mechanism'] is not in means plus function form." Id. Thus, in
interpreting the term "detent mechanism" the Court did not apply
the presumption that § 112, ¶ 6 applied.  Rather, the Court
specifically distinguished the term "detent mechanism" from the
interpretation of terms which expressly employed the word "means"
by noting that, "[i]n this case, by contrast, the element in
question did not use conventional 'means-plus-function' language,
no other element of the claim was in means-plus-function form,
and nothing cited to us from the prosecution history or elsewhere
suggests that the patentee intended to claim in that fashion."
Id. at 1584 (citing Interspiro USA, Inc. v. Figgie Intern., Inc.,
815 F. Supp. 1488, 1504 (D. Del. 1993), aff'd, 18 F.3d 927, 930
(Fed. Cir. 1994) (construing the term "detent means" to express a
means-plus-function limitation in accordance with § 112, ¶ 6)).
Thus, Quantum's reliance on Greenberg for the proposition that it
would be improper for a court to imply functionality "by using
the gerund form of the word [preceding the word 'means']" is
misplaced.  See also Bausch & Lomb Inc. v. Moria S.A., 222 F.
Supp. 2d 616, 635 (E.D. Pa. 2002) (finding that the term "guide

means" was "used in the identified claims [to] recite the
function of guiding"); <u>Signtech USA, Ltd. v. Vutek, Inc.</u>, 174
F.3d 1352, 1356 (Fed. Cir. 1999) (finding that "the claim element
'ink delivery means' uses the term 'means' in association with a
function, namely 'ink delivery'").

Construction of the term "filter means" in accordance with §
112, ¶ 6 is supported by the functional usage of the word
"filter" throughout the patent's specification and prosecution
history. <u>See</u> <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d
1576, 1584 (Fed. Cir. 1996) (noting that in construing an
asserted claim, the Court will consider the intrinsic evidence of
record, namely, the claims themselves, the patent specification,
and the prosecution history). The Summary of the Invention
section of the '165 Patent notes that, in the preferred
embodiment of the patent, "a microprocessor can collect a number
of readings and perform signal averaging and nonlinear filtering
to effectively compensate for both impulse and stochastic noise,
thereby allowing an increased effective gain of the sensor." Col
3, lines 36-39. In describing figure four of the '165 Patent,
the specification notes that "the controller 52 can take a
reading after each individual cycle of the discharging switch 50,
and then integrate (or otherwise filter) the readings over a
number of cycles prior to making a logical decision resulting in
a control output." Col. 6, lines 55-58. These specification
references employ the word "filter" in a functional capacity.
Additionally, in the patent prosecution history, the applicant

distinguished the '165 Patent from prior art by using the word
"filter" in an explicitly functional manner, noting that the
claimed invention "can substantially completely discharge the
capacitor being measured on each operating cycle; which can
selectively filter the output from the charge detector, and which
can provide a <u>filtering function</u> within the charge detector
itself."  '165 Patent Pros. History, Prelim. Amend. B., Defs.
Joint Claim Constr. Br., Ex. 2 (emphasis added).  Thus, in light
of the claim language, patent specification, and prosecution
history, the Court finds that the term "filter means" as used in
claim 42 recites the function of filtering and, therefore,
expresses a means-plus-function limitation in accordance with §
112, ¶ 6.

     <u>C.  Corresponding Structure</u>

     Construction of a means-plus-function limitation involves
two steps.  <u>Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.</u>,
296 F.3d 1106, 1113 (Fed. Cir. 2002).  After identifying the
claimed function, the court must determine what structure
disclosed in the specification corresponds to the claimed
function.  <u>Id.</u>  For a structure to qualify as corresponding, it
must perform the claimed function and the specification must
clearly associate the structure with performance of the function.
<u>Id.</u>  Where an applicant fails to set forth in the patent
specification an adequate disclosure of what is meant by a means-
plus-function claim, "the applicant has in effect failed to
particularly point out and distinctly claim the invention as

required by the second paragraph of section 112." In re
Donaldson Co., 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc).
The statutory presumption of patent validity requires proving the
lack of corresponding structure by clear and convincing evidence.
Default Proof Credit Card System, Inc. v. Home Depot U.S.A.,
Inc., 412 F.3d 1291, 1297 (Fed. Cir. 2005).  "The requirement
that the claims particularly point out and distinctly claim the
invention is met when a person experienced in the field of the
invention would understand the scope of the subject matter that
is patented when reading the claim in conjunction with the rest
of the specification." Id. at 1298 (internal citations omitted).
"Although expert testimony and declarations are useful to confirm
that the construed meaning is consistent with the denotation
ascribed by those in the field of the art, such extrinsic
evidence cannot be used to vary the plain language of the patent
document." Id.

    As stated above, the Court finds that the claimed function
of the term "filter means" is that of filtering.  With respect to
the identification of a structure within the patent specification
which corresponds to the function of filtering, Defendants argue
that the specification teaches that only the controller, and not
the charge detector, performs a filtering function.  Because
claim 42 alleges a "charge detector comprising filter means,"
Defendants contend that the specification fails to adequately
show a structure corresponding to the filter means stated in
claim 42.

In support of this argument, Defendants point to the specification language which addresses the function of filtering. Particularly, the specification teaches that:

> [T]he controller 52[5] can take a reading after each individual cycle of the discharging switch 50, and then integrate (or otherwise filter) the readings over a number of cycles prior to making a logical decision resulting in a control output. Also, as will be understood by those skilled in the art, various combinations of signal integration cycles by the charge detector 56 and by internal algorithmic processes in the controller 52 may be used.

'165 Patent, Col. 6, lines 55-62 (emphasis added); see also Col. 3, lines 36-39 ("a microprocessor can collect a number of readings and perform signal averaging and nonlinear filtering to effectively compensate for both impulse and stochastic noise, thereby allowing an increased effective gain of the sensor") (emphasis added).  Conversely, where the specification describes the charge detector, it makes no mention of any filtering function.  See, e.g., '165 Patent, Col. 6, lines 45-49 ("After a predetermined number of cycles of charge and discharge, the charge detector 56 is examined for total final charge by the controller 52, and as a result the controller 52 may generate an output control signal on an output line 58"); Col. 9, lines 27-33 ("The preferred charge detector 56 is merely a comprises 106

---

[5]  The patent specification also refers to the controller, identified as component 52, as a "microprocessor."  See '165 Patent, Col. 6, lines 36-39 ("At the end of the charging interval the discharging switch 50, which is preferably controlled by a microprocessor 52 . . . closes briefly.").

[sic], which has a value of 0.05 µF in one embodiment.  A reset mosfet transistor 108, preferably of type BSN10, is used to reset the charge detecting capacitor 106 after each pulse, or burst of pulses, used in a measurement is read through the amplifier subsystem 104.").

Quantum admits that the patent specification discloses the function of filtering in the controller device.  Opp'n to Mot. for Part. Summ. J. 15.  Quantum alleges, however, that, in some embodiments, the controller can act as part of the charge detector and can perform the function of filtering.  Thus, Quantum argues that this "combination of a filtering portion of the controller and the charge detector is sufficient disclosure to support the 'filter means' claim language of claim 42."  Id.

Alternatively, Quantum argues that the capacitor located within the charge detector, identified in the specification as component 106, functions as a filter in accordance with claim 42. Quantum admits that "the plain meaning of [claim 42] is that . . . the charge detector includes a 'filter means.'"  Id. at 16 (emphasis added).  Relying on extrinsic evidence, Quantum contends that "it is common in electrical engineering practice to refer to a capacitor as a filter because of its filtering capabilities."  Id. (citing Malmstadt, Enke & Crouch, Module 2: Control of Electrical Quantities in Instrumentation 183-86 (1973)).  Thus, Quantum contends that the structure corresponding to the "filter means" claim language may be the capacitor component of the charge detector.

13

Additionally, Quantum argues that the word "filter" may refer to the process of aggregating or integrating charge cycles. Quantum notes that "it is commonly understood by one skilled in the art that an integrator is also considered a filter" and that "an integrating or aggregating filter is another way to supply the 'filter means' of claim 42." Opp'n to Mot. for Part. Summ. J. 18. The specification teaches that the charge detector may aggregate charge over the course of numerous cycles. See, e.g., '165 Patent, Col. 6, lines 42-45 ("The charge-discharge process can be repeated numerous times, in which case the charge measurement means 56 aggregates the charge from the plate 12 over several operating cycles."). Including this interpretation of the word "filter," Quantum alleges that "skilled readers of the '165 Patent would understand the use of the term 'filter means' in Claim 42 to be referring to the use of a capacitor and/or an integrator and/or a digital filter and that part of the charge detector may be physically located within the controller while electronically functionally located within the charge detector[.]" Opp'n to Mot. for Part. Summ. J. 19.

As is suggested by the nature of Quantum's alternative arguments, the patent specification fails to disclose a charge detector comprising a structure which is clearly linked to the function of filtering, as recited in claim 42. See Default Proof, 412 F.3d at 1298 (noting that a structure qualifies as corresponding for the purposes of § 112, ¶ 6 "only if the specification or prosecution history clearly links or associates

14

that structure to the function recited in the claim"). First,
Quantum's argument that the microprocessor can act as part of the
charge detector, or that claim 42 may refer to a combination of
the controller and the charge detector, is unsupported by the
specification language and the prosecution history. Claim 42
requires a "<u>charge detector comprising</u> filter means." '165
Patent, Col. 18, lines 62-63; <u>see also</u> '165 Patent Pros. History,
Prelim. Amend. B., Defs.' Joint Claim Construction Br., Ex. 2
(distinguishing the '165 Patent invention from prior art by
noting that the claimed invention "can substantially completely
discharge the capacitor being measured on each operating cycle;
which can selectively filter the output from the charge detector,
and which <u>can provide a filtering function within the charge
detector itself</u>") (emphasis added). Further, the patent
specification and diagrams describe the charge detector and the
controller as separate entities, with the charge detector
performing the function of charge storage and the controller
performing the function of examining the accumulated charge in
the detector after several cycles have been completed, or, if set
to examine the detector after each cycle, of filtering the
readings taken from the charge detector. The specification
teaches these separate functions by providing that "[a]fter a
predetermined number of cycles of charge and discharge, the
charge detector 56 <u>is examined for total final charge by the
controller 52</u>, and as a result the controller 52 may generate an
output control signal on an output line 58 . . . .

15

Alternatively, the controller 52 can take a reading after each
individual cycle of the discharging switch 50, and then integrate
(or otherwise filter) the readings over a number of cycles prior
to making a logical decision resulting in a control output."
'165 Patent, Col. 6, lines 45-59.

Second, there is no intrinsic support for Quantum's
contention that the capacitor component within the charge
detector performs the filtering function.  Quantum's argument
relies primarily on a textbook passage which notes that "[a]
rather effective filter is simply a large capacitor in parallel
with a load $R_L$."  Malmstadt, et al., Module 2: Control of
Electrical Quantities in Instrumentation 183 (1973).  Neither the
specification language of the '165 Patent, nor its diagrams,
however, show that the capacitor contained within the charge
detector is in parallel with a resistance.  See, e.g., '165
Patent, Fig. 7 (depicting the components of the charge detector
56).

Finally, no intrinsic evidence supports Quantum's contention
that the word "filter" may simply refer to the process of
aggregating or integrating charge cycles.  To the contrary, the
specification delineates the aggregation of charge cycles in the
charge detector from the filtration of those cycles through the
microprocessor.  See '165 Patent, Col. 3, lines 34-40 (noting
that "[a] preferred embodiment of the invention comprises a
holding capacitor to measure the charge drained from the plate.
In this embodiment, a microprocessor can collect a number of

16

readings and perform signal averaging and nonlinear filtering to effectively compensate for both impulse and stochastic noise, thereby allowing an increased effective gain of the sensor."); <u>Default Proof</u>, 412 F.3d at 1302 ("[E]xtrinsic evidence cannot be used to vary the plain language of the patent document.").

In sum, the specification discloses no structure corresponding to the "charge detector comprising filter means" of claim 42.  As such, claim 42 fails to fulfill the requirements of § 112, ¶ 2, and must be rendered invalid.  <u>See</u> <u>All Dental Prodx, LLC v. Advantage Dental Prods.</u>, 309 F.3d 774, 779-780 (Fed. Cir. 2002) (noting that the harm of failure to comply with the requirements of § 112, ¶ 2, is the patent's inability to "give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public . . . can determine whether or not they infringe").  For the same reasons, the dependent claims at issue in this case, claims 43-46, and 49, are also rendered invalid.  <u>See</u> <u>Cardiac Pacemakers</u>, 296 F.3d at 1114 (noting that the failure to disclose a structure corresponding to the claim function render the claim and its dependent claims invalid).

## III.  CONSTRUCTION OF THE REMAINING CLAIMS IN SUIT

### A. Legal Standard for Claim Construction

Claim construction is a question of law, to be determined by the Court.  <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 976 (Fed. Cir. 1995) (<u>en</u> <u>banc</u>), <u>aff'd</u>, 517 U.S. 370 (1996).  In construing an asserted claim, the Court will first consider the

intrinsic evidence of record, namely, the claims themselves, the patent specification, and the prosecution history.  See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1584 (Fed. Cir. 1996).

The words of a claim are generally given their "ordinary and customary meaning[,]" which is the meaning that "the term would have to a person of ordinary skill in the art in question at the time of the invention[.]"  Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).  A patentee, however, may choose to use terms in a manner other than their ordinary meaning, provided that the definition of the term is clearly stated in the patent specification or the file history.  Vitronics, 90 F.3d at 1582.  Further, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."  Phillips, 415 F.3d at 1314.

In addition to the claim terms themselves, the Court will look to the patent specification to interpret the words or phrases of a patent claim.  Id. at 1315.  The specification "is the single best guide to the meaning of a disputed term."  Id. (quoting Vitronics, 90 F.3d at 1582); see also Markman, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are a part.").

The final tier of intrinsic evidence guiding the construction of claims is the prosecution history of the patent.  Id. at 1317.  The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor

18

understood the invention and whether the inventor limited the
invention in the course of prosecution, making the claim scope
narrower than it would otherwise be."  Id.; see also Southwall
Tech., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir.
1995) (finding that the prosecution history "limits the
interpretation of claim terms so as to exclude any interpretation
that was disclaimed during prosecution").

    While less significant than intrinsic evidence, the Court
may also rely on extrinsic evidence in interpreting patent
claims.  Phillips, 415 F.3d at 1317.  Extrinsic evidence
"consists of evidence external to the patent and prosecution
history, including expert and inventor testimony, dictionaries,
and learned treatises."  Markman, 52 F.3d at 980.  Consideration
of extrinsic evidence "is unlikely to result in a reliable
interpretation of patent claim scope unless considered in the
context of intrinsic evidence."  Phillips, 415 F.3d at 1319.

    B. "Ground" or "Electrical Ground"

    The parties disagree over the construction of the terms
"ground" and "electrical ground" as used in claims 50 and 58.[6]
The relevant language of those claims provides for "[an]
[a]pparatus for measuring a capacitance to ground of a plate[,]"
'165 Patent, Col. 19, lines 41-42, and "[a] method of operating a
capacitive sensor electrically connected between an electrical
ground and a sensing plate disposed adjacent an external surface

_____

    [6]  Due to the Court's decision to invalidate claim 42 and
its dependent claims, construction of disputed terms within those
claims is no longer required.

of a first object, the sensor measuring a capacitive change
responsive to a second object adjacent the first object, the
second object separately electrically coupled to the ground[.]"
'165 Patent, Col. 20, lines 23-28.

Generally, the word "ground" may have two meanings in
electronics.  Delton T. Horn, <u>Basic Electronics Theory</u> 52 (4th
ed. 1993).  It may refer to an "earth ground" which is a device
that offers protection from electrical current by directing
voltage to the earth itself.  <u>Id.</u>  It may also refer to a "common
ground" which is typically a common point in a circuit with a
fixed voltage, such that voltages at other points may be measured
in reference to it.  <u>Id.</u>  Quantum contends that, in claims 50 and
58, "ground" refers to a "common ground."[7]  Defendants contend
that the appropriate construction of the term "ground" would
limit its meaning to "earth ground."  Defs.' Joint Claim Constr.
Br. 22.

As mentioned above, the sensor system described in the '165
Patent can be used for controlling the supply of water emitted
from faucets and drinking fountains.  Many claims of the '165
Patent describe apparatuses used specifically for controlling
water delivery.  The parties do not dispute that, in those
claims, and in the specification language describing their
preferred embodiments, the patent uses the term "ground" to refer

---

[7]  Specifically, Quantum argues that the term "ground"
should be construed as "any reference voltage, 'ground' as in a
reference voltage for comparison to allow voltages to be measured
and/or allow current to flow within a circuit."  Quantum's
Opening Claim Constr. Br. 1.

specifically to "earth ground." <u>See, e.g.</u>, '165 Patent, Col. 4,
lines 48-54 ("Turning initially to FIG. 1 of the drawing . . .
[t]he water film 18 is shown in contact with both a spout 21 of a
water faucet and another metallic object 20 <u>connected to an earth
ground 22.</u>") (emphasis added).  Noting the use of the term "earth
ground" in the specification language, Defendants contend that,
had the inventor intended certain patent claims to function with
common ground, he would have had to make that intention clear by
referencing the words "common ground."  Neither the specification
nor the claim language of the '165 Patent employ the specific
term "common ground" and, therefore, Defendants argue that
construction of any reference to "ground" must be limited to
earth ground.  <u>See</u> <u>Inpro II Licensing, S.A.R.L. v. T-Mobile USA,
Inc.</u>, 450 F.3d 1350, 1355 (Fed. Cir. 2006) (noting that
"[a]lthough claims need not be limited to the preferred
embodiment when the invention is more broadly described, neither
do the claims enlarge what is patented beyond what the inventor
has described as the invention") (internal quotations omitted).

   The Court disagrees with Defendants' limited reading of the
term "ground" with respect to the disputed claims in the '165
Patent.  The parties do not dispute that the specific references
to "earth ground" in the '165 Patent relate to figures depicting
preferred embodiments of water control apparatuses.  In those
diagrams, the depiction of earth ground is labeled as component
22.  '165 Patent, Figs. 1, 2, 4, 8, 9.  Conversely, in the
figures depicting circuits representative of the claims which do

not specifically refer to devices for the control of water flow,
no reference is made to component 22.  '165 Patent, Figs. 5, 7;
compare with Inpro, 450 F.3d at 1354-55 (noting that the
specification described the component in question in only one
manner throughout the patent and emphasized the importance of
that particular type of component in solving the problems in the
existing art).  The specification language describing those
figures makes no mention of the term "earth ground."
Additionally, Quantum has presented extrinsic evidence indicating
that, when used in reference to an electrical circuit, one
skilled in the art would understand the general term "ground" to
refer to "a reference point from which voltage measurements are
made."  Stephen R. Matt, Electricity and Basic Electronics 119
(1998).  Thus, the Court finds that an ordinary artisan would
understand the term "ground" as used in the disputed claim
language to refer simply to a reference point in a circuit used
to measure voltages in the circuit.

 C. "Reading the Output of the Charge Detector"

 The parties next disagree as to the meaning of the phrase
"reading the output of the charge detector" as it appears in
claim 58.  The disagreement over the interpretation of this
phrase primarily concerns whether the claim requires that the
"reading" occur after a predetermined number of charge cycles
have been completed.  In full, claim 58 provides:

> A method of operating a capacitive sensor
> electrically connected between an electrical
> ground and a sensing plate disposed adjacent
> an external surface of a first object, the

        sensor measuring a capacitive change
        responsive to a second object adjacent the
        first object, the second object separately
        electrically coupled to the ground, the
        method comprising the steps of:

        a) charging the plate from a voltage source;

        b) connecting, for a discharging interval
        having a predetermined discharging duration,
        the plate to a charge detector having an
        output representative of the change of the
        capacitance to ground of the plate; and

        c) reading the output of the charge detector.

'165 Patent, Col. 20, lines 23-36 (emphasis added).

    The interpretation of the above emphasized claim language
generally involves a disagreement as to whether the '165 Patent
specifies a particular method for measuring the charge in the
charge detector.  The parties agree that, generally, two methods
exist to achieve such a measurement: (1) the fixed cycle method,
and (2) the voltage threshold method.  Under the fixed cycle
method, the voltage of the controller measures the output of the
charge detector after a predetermined number of charge cycles and
compares that output to previously established reference voltages
to determine the presence of a human hand.  See Hal Phillip,
Relaxation Causes Stress, Components in Electronics (Sept. 2006).
Under the voltage threshold method, "the charge on the [charge
detector] can accumulate until it reaches a reference voltage, at
which point control logic notes the number of cycles required to
reach that voltage and discharges the [charge detector]."  Id.
Under this method, by analyzing the ratio of the accumulated
voltage to the number of charge cycles required to reach the

23

voltage and comparing it to reference ratios, the controller can
determine the presence of a human hand.  Quantum contends that
the disputed claim phrase should be construed to allow
measurement of the output of the charge detector under either the
fixed cycle or the voltage threshold method.  Defendants argue
that the method for measuring the output of the charge detector
must be limited to the fixed cycle method.

Only one paragraph of the patent specification references
the process by which readings of the output of the charge
detector are made.  That specification language provides:

> The charge-discharge process can be repeated
> numerous times, in which case the charge
> measurement means 56 aggregates the charge
> from the plate 12 over several operating
> cycles.  <u>After a predetermined number of
> cycles of charge and discharge</u>, the charge
> detector 56 is examined for total final
> charge by the controller 52, and as a result
> the controller 52 may generate an output
> control signal on an output line 58 . . . .
> Alternatively, the controller 52 can take a
> reading <u>after each individual cycle of the
> discharging switch 50</u>, and then integrate (or
> otherwise filter) the readings over a number
> of cycles prior to making a logical decision
> resulting in a control output.

'165 Patent, Col. 6, lines 42-59.

Quantum argues that the above cited language "presents
several alternatives for the reading of the representation."
Quantum's Opening Claim Constr. Br. 20.[8]  The Court finds,

---

[8]   Quantum also argues that, because both methods of
measurement achieve the same result through simple algebraic
analysis, it is inconsequential which method is employed in
achieving a reading of the capacitance of the charge detector.
Quantum's Opening Claim Constr. Br. 21.  Because certain
advantages exist, however, for an invention with the ability to

however, that the above paragraph simply describes alternative
ways of implementing the fixed cycle method.  The specification
language is clear that, the charge is either examined after a
predetermined number of cycles, or after each single cycle.
Nowhere does the specification indicate the possibility that the
charge detector will be examined once a reference voltage is
reached and then make an analysis as to the number of cycles
required for the detector to accumulate that voltage.

     Thus, the Court construes the phrase "reading the output of
the charge detector" to incorporate utilization of the fixed
cycle method, and, therefore, refers to measuring the voltage of
the charge detector following a predetermined number of charge-
discharge cycles.

     D.   "Interval of Pseudo-random Duration"

     The phrase "interval of pseudo-random duration" found in
claims 46 and 61, refers to the time interval between each pulse
of charge or discharge.  These pulses are varied at "pseudo-
random intervals" so that the pulses of multiple units in close
proximity do not interfere with one another.  Both parties offer
constructions of this claim phrase which are materially similar.
Defendants contend that construction of the phrase must give
weight to the concept of pseudo-randomness and, thus, argues that

employ the voltage threshold method, the methodology employed in
reading the output of the charge detector is a matter of
consequence.   See Hal Phillip, Relaxation Causes Stress,
Components in Electronics (noting that the voltage threshold
method "takes a little longer to acquire a signal but requires no
analogue components or ADC, making the acquisition process very
low cost").

the phrase refers to the "implementation of a signal pulse offset
that is not fixed, and thus pseudo-random, to avoid interference
between different sensing plates."  Defs.' Joint Claim Constr.
Br. 38.  Quantum contends that the term "not fixed" in Defendants
proffered construction would require complete randomness.  Thus,
Quantum argues a better construction would simply find that the
claim language refers to "the implementation of signal pulse
offset to avoid interference between different sensing plates."
Quantum's Opening Claim Constr. Br. 3.

     Both parties agree that the term "pseudo-random" refers to a
sequence of numbers which reflects the properties of randomness
but which, in actuality, is not truly random.  See The New IEEE
Standard Dictionary of Electrical and Electronics Terms 1024 (5th
ed. 1993) (defining "pseudo-random number sequence" as "[a]
sequence of numbers, determined by some defined arithmetic
process, that is satisfactorily random for a given purpose").
For example, the digits of the mathematical constant Pi appear
facially random but are, in actuality, a representation of the
ratio of a circle's circumference to its diameter.  Quantum and
Defendants both agree that the digits of Pi can be used in the
creation of a pseudo-random number.  See Claim Constr. Hearing
Tr. 25-26:25-02 (Quantum noting that "if you have a pattern of
numbers, like Pi . . . it appears random, but it's not
necessarily random"); Claim Constr. Hearing Tr. 136:6-12
(Defendants noting that "[o]ne way to create a psuedo-random
sequence of numbers is [] take this Pi number . . . .  It

26

actually goes on for a very, very long time, but you could, every
fifth digit, take a number.  Then you have a sequence . . . .
You've just created a pseudo-random number[.]").

     The Court finds that an appropriate construction of the
claim term would not require true randomness in the sequence of
interval durations, but, rather, would include reference to the
concept of pseudo-randomness.  Thus, a person skilled in the art
would construe the term "interval of pseudo-random duration" to
refer to the implementation of a signal pulse offset, the
duration of which appears random, but in actuality is not truly
random.

     E.  "Reset Means for Resetting the Charge Measurement
Capacitor to a Second Predetermined Voltage"

     Like their disagreement regarding the construction of the
phrase "reading the output of the charge detector," the parties
also disagree as to whether construction of the phrase "reset
means for resetting the charge measurement capacitor to a second
predetermined voltage" found in claim 50, requires utilization of
the fixed cycle charge measurement method.  Quantum contends that
no such limitation should be read into the phrase.  Defendants
argue that a reset signal may only be sent following a reading of
the charge detector, which, in turn, may occur only after a
predetermined number of charge-discharge cycles.

     The parties agree that the disputed claim language expresses
a means-plus-function limitation and, therefore, must be
interpreted in accordance with 35 U.S.C. § 112, ¶ 6.  As stated
above, construction of a means-plus-function limitation involves

27

two steps.  <u>Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.</u>,
296 F.3d 1106, 1113 (Fed. Cir. 2002).  The court must identify
the claimed function and then determine what structure, if any,
disclosed in the specification corresponds to the claimed
function.  <u>Id.</u>  Here, the claimed function is clear from the
claim language, namely "resetting the charge measurement
capacitor to a second predetermined voltage."  '165 Patent, Col.
19, lines 55-56.  The structure corresponding to the claimed
function is described in the patent specification as follows:

> In operation, the controller 52 operates
> according to the settings of switches on the
> control input lines 60 for sensitivity, time
> delays, and the like. A program stored in
> read only memory 112 governs the operation of
> the microprocessor. Periodically, for example
> once every ten milliseconds, the controller
> 52 issues a command to pulse-generating
> circuit 100, causing one or more pairs of
> successive pulses 70 (inverted) and 74 to be
> applied to the two mosfet switches 50, 62.
> These pulse-pairs may be supplied singly, or
> as burst of pulse pairs issued within a short
> time (e.g., several tens of microseconds),
> depending on the measurement environment. The
> controller issues the appropriate measurement
> offset on appropriate control lines 114, and
> after a brief delay to allow the circuit to
> settle, an analog to digital converter (ADC)
> 116 integral to the controller 52 digitizes
> the voltage on an input line 118 and thereby
> supplies a digital representation of the
> charge aggregated in the charge measurement
> means 56 to the controller 52. <u>Following
> this, the reset line 119 is asserted and the
> reset mosfet 108 resets the detecting
> capacitor 106.</u>

'165 Patent, Col. 9, lines 48-67 (emphasis added).

Defendants argue that, prior to implementation of the reset
means, the controller must measure the charge from the charge

28

detector.  Because Defendants contend that this measurement requires utilization of the fixed cycle method, they contend that resetting the charge measurement capacitor must also be construed to incorporate usage of the fixed cycle measurement method.

While, as stated above, the Court agrees with Defendants that reading the output from the charge detector requires utilization of the fixed cycle method, it finds inclusion of reference to the fixed cycle method in construction of the instant claim term inappropriate.  As reflected in the above quoted specification language, the resetting of the charge detector occurs <u>following</u> the controller's receipt, via an input line, of the digital representation of the charge aggregated in the charge detector.  The Court has already construed the phrase "reading the output of the charge detector" to incorporate utilization of the fixed cycle method.  Inclusion of the definition of this measurement procedure as a necessary part of the reset procedure, therefore, would be superfluous.

Thus, the Court finds that, in construing the structure corresponding to the function of "resetting the charge measurement capacitor to a second predetermined voltage," no reference to the fixed cycle method, or to a "predetermined number of cycles" is required.

### VI.  CONCLUSION

For the reasons set forth above, Defendants' Motion for Partial Summary Judgment will be granted.  The Court construes the remaining disputed terms in the '165 Patent as follows:

29

     * The term "ground" or "electrical ground" refers to a
reference point in a circuit used to measure voltages in the
circuit.

     * The phrase "reading the output of the charge detector"
refers to measuring the voltage of the charge detector following
a predetermined number of charge-discharge cycles.

     * The phrase "interval of pseudo-random duration" refers to
the implementation of a signal pulse offset, the duration of
which appears random, but in actuality is not truly random.

     * The phrase "reset means for resetting the charge
measurement capacitor to a second predetermined voltage"
expresses a means-plus-function limitation.  The claimed function
is resetting the charge measurement capacitor to a second
predetermined voltage.  The corresponding structure for achieving
the claimed function is "the reset line 119 is asserted and the
reset mosfet 108 resets the detecting capacitor 106."  '165
Patent, Col. 9, lines 65-67.  This structural language does not
require incorporation of the fixed cycle measurement method.

     A separate order will follow.


                    _____/s/_____
                    William M. Nickerson
                    Senior United States District Judge

Dated: June 7, 2007




                              30